### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DENNIS J. ATIYEH,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SHIRLEY HADEED and** | : | |
| **DAVID HADEED** | : | |
| **Defendants** | : | **04-2621** |

Gene E.K. Pratter, J.          Memorandum and Order          March 19, 2007

  This litigation may prompt one to conclude, with great dismay, that the most vitriolic fights over money are those that involve family. Certainly, the alleged loan that is the root of this suit provides a backdrop for unrestrained hysteria and hyperbole. Because the Court concludes that no jurisdiction lies in this Court, these warring family members will no longer have a stage here on which to emote.

  On the surface, this case presents a straightforward civil procedure and federal jurisdiction issue. That is the only thing straightforward about this case. Defendants Shirley and David Hadeed move to dismiss Plaintiff Dennis Atiyeh's Amended Complaint pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction. Mr. Atiyeh's Amended Complaint presents state law claims for breach of contract and unjust enrichment against the Hadeeds. Mr. Atiyeh is a resident of Pennsylvania and both Defendants are residents of Florida,[1] and the amount of controversy exceeds $75,000. Mr. Atiyeh's only basis for jurisdiction is the parties' diverse citizenship.[2] In their Motion to Dismiss, Defendants argue that the Court lacks

---

[1] During discovery in this case, the Defendants indicated that they reside in Florida and Jamaica.

[2] The Defendants' Notice of Removal alleged that subject matter jurisdiction is proper based on the diversity of citizenship of the parties, pursuant to 28 U.S.C. § 1332. Def. Notice of Removal ¶ 1.

personal jurisdiction over them because there are insufficient contacts between them and the Commonwealth of Pennsylvania.  For the reasons stated below, Defendants' Motion to Dismiss will be granted.

To declare that there is not a single undisputed fact in this case would not be an overstatement.  The following description of the factual background of this case presents Mr. Atiyeh's side of the story.  The numerous factual discrepancies, including the multiple disputes of facts pertaining to jurisdiction, will be examined as part of the Discussion.

FACTUAL AND PROCEDURAL BACKGROUND

Mr. Atiyeh alleges that "on or about 1996," he met with Shirley and David Hadeed, as well as Anise Hadeed,[3] who was Shirley's husband and David's father, in Lehigh County, Pennsylvania.[4]  Am. Compl. ¶ 6.  Mr. Atiyeh claims that at this meeting, he agreed to loan $500,000 to "all Defendants, jointly and severally."[5]  Id. ¶ 7.  According to Mr. Atiyeh, the "Defendants" agreed to accept the loan and a corresponding repayment schedule that provided for payments of interest at an annual rate of 15%.  D. Atiyeh Aff. ¶ 3.  Mr. Atiyeh asserts that the "Defendants" only repaid a

---

[3] Anise Hadeed passed away before Mr. Atiyeh commenced this lawsuit.

[4] Mr. Atiyeh testified that Anise Hadeed was his great aunt's son, which, he claims, by virtue of "tradition" makes Anise Hadeed his uncle, Shirley his aunt and David his cousin.  July 7, 2005 Tr. 25:22–26:4.

[5] Mr. Atiyeh's Amended Complaint is replete with non-particularized assertions of fact.  He avers the occurrence of specific events as "on or about" entire calendar years.  He never refers to any one of the defendants by name.  For example, his Amended Complaint stated that he loaned $500,000 to "all Defendants, jointly and severally" and that "Defendants" repaid a portion of the loan.  Am. Compl. ¶¶ 7-8.  However, the named defendants in his Amended Complaint included Shirley Hadeed and David Hadeed, who is named both individually and in his capacity as representative of the estate of Anise Hadeed.  It is clear, however, that Mr. Atiyeh did not intend to assert that he met with and loaned money to "David Hadeed in his capacity as representative of the estate of Anise Hadeed," since in 1996, Anise Hadeed was very much alive.

portion of the loan, leaving an unpaid balance of $315,000.  Am. Compl. ¶ 8.  He alleges that in January 1999, the "Defendants" wrote him a "check" for $315,000, but that the check was returned by the payor bank with a notification that the account had been closed.  Id. ¶¶ 9-10.[6]

Mr. Atiyeh further alleges that he met with the "Defendants" again "on or about 2000" in Lehigh County, Pennsylvania.  Id. ¶ 11.  During this meeting, Mr. Atiyeh alleges that he and the "Defendants" agreed to extend the time of repayment of the loan, with the balance newly agreed to be due in 2002.  Id. ¶ 12.[7]

Mr. Atiyeh filed his original complaint in this action in the Court of Common Pleas of Lehigh County, Pennsylvania.  The Defendants removed the action to this Court, and filed a demand for a trial by jury on June 15, 2004 (Docket No.1).  Mr. Atiyeh's complaint demanded relief of $315,000, plus interest at an annual rate of 15% since January 1996 (not 2002), plus fees and costs.

Mr. Atiyeh's original complaint named Shirley and David Hadeed, as well as the "Estate of Anise Hadeed," as defendants.  The Estate filed a Motion to Dismiss the Complaint for Lack of Service on June 23, 2004 (Docket No. 2).  Mr. Atiyeh did not oppose this motion, and the Court granted it on July 14, 2004 (Docket No. 7).  The Estate of Anise Hadeed was removed as a defendant in this case.

Mr. Atiyeh then filed an Amended Complaint on July 21, 2004 (Docket No. 9), in which he named Shirley Hadeed and David Hadeed, in his individual capacity and as the "Representative of

_____

[6] Mr. Atiyeh has not produced this check.  As discussed infra, he did produce a withdrawal slip, dated March 26, 1996, signed by Anise Hadeed in the amount of $200,000, which Mr. Atiyeh claimed was the bad "check" he referred to in his Amended Complaint.  July 5, 2006 Tr. 5:9-17.

[7] Mr. Atiyeh claims that, during the parties' meeting "on or about 2000," they agreed to extend the term of the loan until 2002.  Am. Compl. ¶ 12.  However, during the discovery permitted on this jurisdictional issue Mr. Atiyeh never established the term of the original loan.

3

the Estate of Anise Hadeed," as defendants.  The Defendants jointly filed a Motion to Dismiss the

Amended Complaint on December 15, 2004 (Docket No. 14), asserting that the Court lacks in

personam jurisdiction over them.

Shortly thereafter, the Court held a status conference during which the issue of personal

jurisdiction was discussed.  Thereafter, the Court agreed to consider the issue of personal

jurisdiction before addressing the merits of Plaintiff's claims.  The Court entered an order

permitting the parties to conduct discovery solely with respect to the issue of whether the Court

could exercise personal jurisdiction over the Defendants, and instructed the parties to file briefs in

support of their respective positions (Docket No. 16).  The Court also scheduled a hearing on the

jurisdictional issue.[8]

The Defendants timely filed their Memorandum in Support of the Motion to Dismiss on May

5, 2005 (Docket No. 22).  Mr. Atiyeh did not file a response to the motion in accordance with the

Court's Scheduling Order, but his counsel indicated that he did intend to file a response.  To

accommodate Mr. Atiyeh's counsel, the Court entered an Order instructing Mr. Atiyeh to file his

response to the motion by June 1, 2005 (Docket No. 24).  The Court further ordered that if no

response was filed by June 1, 2005, the Defendants' Motion to Dismiss would be considered

unopposed.  Again, Mr. Atiyeh did not file a response with the Court by June 1, 2005, as he was

ordered to do.  However, in the early hours of the morning of June 2, 2005, Mr. Atiyeh submitted a

---

[8] The Court's Order stated that discovery with respect to the issue of personal jurisdiction must be completed by February 25, 2005, that the parties' briefs must be filed by March 17, 2005, and the hearing would be scheduled for March 24, 2005 (Docket No. 16).  Due to some logistical issues pertaining to taking Mr. Atiyeh's deposition, the Court agreed to extend the Defendants' deadline for submitting briefs until May 5, 2005, extend the Plaintiff's deadline until May 11, 2005, and reschedule the hearing for May 25, 2005 (Docket Nos. 20, 21).

response directly to Chambers and to counsel for the Defendants by facsimile.[9]

On July 7, 2005, the Court presided over oral arguments and held an evidentiary hearing on the issue of in personam jurisdiction. Counsel for Mr. Atiyeh conducted a direct examination of Mr. Atiyeh on that date, but defense counsel was unable to complete his cross-examination. On July 11, 2005, the Court issued an Order requiring the parties to notify the Court by July 22, 2005 of their respective positions concerning resumption of the hearing on jurisdiction (Docket No. 31).

The Defendants promptly responded to the Court's Order (Docket Nos. 33, 35). They stated that they were content to rest on their motion papers, but in the event that the Court would permit additional evidence to be submitted on the issue of jurisdiction, Defendants wished to submit further evidence and produce witnesses to testify on the jurisdictional issue. Again, Mr. Atiyeh did not respond.

On September 9, 2005, the Court held a hearing to show cause why Mr. Atiyeh's partial testimony should not be stricken from the record. The Court ultimately concluded that under the circumstances extant Mr. Atiyeh's testimony would not be stricken, but also held that counsel for the Defendants was permitted to apply for costs as a sanction against Mr. Atiyeh and/or his counsel arising from various unjustified delays and detours. Defendants submitted an application for costs in the amount of $962.25 (Docket No. 40), which the Court approved (Docket No. 46).

On September 14, 2005, Defendants filed a Supplemental Motion to Dismiss David Hadeed in his Purported Capacity as Representative of the Estate of Anise Hadeed (Docket No. 41). Mr. Atiyeh did not oppose this motion, and the Court granted it on October 11, 2005 (Docket No. 50). David Hadeed as Representative for the Estate of Anise Hadeed was removed as a defendant in this

---

[9] Mr. Atiyeh's response was never formally filed and to this day does not appear on the Court's docket for this case.

case.  The only remaining defendants, then and now, are Shirley and David Hadeed.

On September 20, 2005, the Court issued an Order that the hearing as to personal jurisdiction would resume on October 21, 2005.  Subsequently, on October 4, 2005, counsel for Mr. Atiyeh submitted the affidavits of Reverend Afaf Atiyeh Darcy and Arif Atiyeh in lieu of having them testify at the continued hearing.

On October 20, 2005, counsel for the Defendants sought and received a continuance of the hearing.  The Court issued an Order rescheduling the hearing for December 6, 2005.  The Order provided that defense counsel would have the opportunity to cross-examine Mr. Atiyeh and to cross-examine any other witness upon whose direct testimony by affidavit Mr. Atiyeh intended to rely (Docket No. 52).  The Order further provided that the direct testimony of any witness via affidavit who did not appear at the hearing for cross-examination would be stricken from the record.

Before December 6, 2005, however, counsel for Mr. Atiyeh was suspended from the practice of law.  On December 7, 2005, this Court issued an Order advising Mr. Atiyeh that he would be given until January 31, 2006, to advise the Court as to whether he had retained new counsel or would proceed pro se.  That Order was returned to the Court, marked as undeliverable.  On February 1, 2006, the Court issued another Order allowing Mr. Atiyeh until February 10, 2006 to find counsel, and scheduling a status conference for March 21, 2006.  There was no return of that Order.

Mr. Atiyeh failed to attend the March 21, 2006 conference.  He later explained that he had been tied up in traffic and could not find the proper courtroom.  To accommodate Mr. Atiyeh, the Court scheduled yet another status conference for June 9, 2006.  On March 28, 2006, Defendants filed a Second Motion to Dismiss (Docket No. 61).  The Court issued an Order allowing Mr. Atiyeh until May 7, 2006 to file a substantive response to Defendants' pending motions (Docket No. 63).

Mr. Atiyeh did not file a response of any kind until July 19, 2006.

At the June 9, 2006 status conference, the parties indicated that they wished to continue the hearing on the issue of personal jurisdiction.  The Court rescheduled the hearing for July 5, 2006. On June 15, 2006, the Court issued an Order requiring Defendants' counsel to inform Mr. Atiyeh, in writing, by June 29, 2006, of the name of each of Plaintiff's witnesses Defendants' counsel intended to cross-examine at the hearing (Docket No. 68).  In accordance with this Order, Defendants' counsel notified Plaintiff that he wished to cross-examine Mr. Arif Atiyeh and Reverend Afaf Atiyeh Darcy.  Mr. Arif Atiyeh is the Plaintiff's father and Reverend Darcy is the Plaintiff's sister.

On July 5, 2006, the Court reconvened the evidentiary hearing.  Defendants' counsel resumed his cross-examination of the Plaintiff, and cross-examined Arif Atiyeh.  Plaintiff was unable to produce Reverend Darcy.  The Defendants introduced the testimony of Ms. Joan Gonzales and Mr. John Assad as fact witnesses, as well as the testimony of Defendants Shirley and David Hadeed.  Counsel for both parties were provided an opportunity to examine (or cross-examine, as appropriate) each of these witnesses.  Defense counsel also introduced several exhibits into evidence.

Following the July 5, 2006 hearing, Mr. Atiyeh filed a Brief in Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Docket No. 72), and Defendants filed a Post-Hearing Brief on Jurisdiction (Docket No. 73).

Now pending before the Court, two and one-half years after this action was filed, and over two years after Defendants first raised the issue of personal jurisdiction, during which Plaintiff was indulged beyond all conventional reason or rule, is Defendants' Second Motion to Dismiss, supplemented by Defendants' post-hearing brief.  Shirley and David Hadeed argue that Mr. Atiyeh

has not proven that sufficient contacts within Pennsylvania exist for the Court to exercise personal jurisdiction over them.

## DISCUSSION

### I.     Standard

After the defendant has raised a jurisdictional defense, the plaintiff bears the burden to come forward with enough evidence to establish, with reasonable particularity, sufficient contacts between the defendant and the forum.  Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Assoc., 819 F.2d 434, 437 (3d Cir. 1987).  The plaintiff "must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence," and "at no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction.  Once the motion is made, plaintiff must respond with actual proofs not mere allegations."  Patterson v. FBI, 893 F.2d 595, 603-04 (3d Cir. 1990) (quoting Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 67 n.9 (3d Cir. 1984) (citation omitted)).

The Court may proceed either based upon affidavits and sworn documents or conduct an evidentiary hearing.  Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is "clearly frivolous."  Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003).  Where no evidentiary hearing has taken place, the plaintiff must make out a prima facie case.  LaRose v. Sponco Mfg., Inc., 712 F. Supp. 455, 458 & n.2 (D.N.J. 1989).  However, if the Court conducts an evidentiary hearing, the plaintiff has the more substantial burden of proving that personal jurisdiction is proper by a preponderance of the evidence.  Id. at 458 (citing Data Disc, Inc. v. Systems Tech. Assocs., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977)); Markferding v. Westmoreland

8

County Domestic Relations Office, No. 05-755, 2005 U.S. Dist. LEXIS 34216, at *4-5 (D.N.J. June 17, 2005); Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 154 (2d Cir. 1999);[10] Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).

Where, as here, a federal court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, a "federal district court may assert personal jurisdiction over a non-resident of the state in which the court sits to the extent authorized" by that state's law.  Fisher v. Teva PFC SRL, No. 05-4238, 2006 U.S. App. LEXIS 31741, 4-5 (3d Cir. Dec. 22, 2006) (citing Provident Nat'l Bank, 819 F.2d at 436). Because Pennsylvania's long-arm statute "provides that its reach is coextensive with the limits placed on the states by the federal Constitution," the Court looks to federal constitutional doctrine to determine whether personal jurisdiction exists over the Defendants.  Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 150 (3d Cir. 1996); 42 Pa. C.S.A. § 5322(b).  A two-part test is used to consider whether the exercise of personal jurisdiction is permissible under the Constitutional limits: (1) the defendant must have "purposefully established 'minimum contacts' in the State," Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985); and (2) the exercise of jurisdiction must be consistent with "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (citations omitted).

**II.    Minimum Contacts**

The Pennsylvania long-arm statute provides for the exercise of general and specific jurisdiction over non-resident defendants.  42 Pa.C.S.A. § 5301, § 5322. The Court may exercise

---

[10] In Credit Lyonnais, the Second Circuit Court of Appeals noted that motions to dismiss under Rule 12(b)(2), in addition to testing the plaintiff's theory of jurisdiction, may also test the facts supporting the jurisdictional theory.  183 F.3d at 153.  In this regard, the court noted that district courts are afforded "considerable procedural leeway" in deciding them.  Id. (quoting Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)).

general jurisdiction over a defendant when the defendant maintains "a continuous and systematic part of its general business within this Commonwealth." 42 Pa.C.S.A. § 5301(2)(iii); <u>see</u> <u>also</u> <u>Helicopteros Nacionales de Colombia v. Hall</u>, 466 U.S. 408, 416, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984) (stating that general personal jurisdiction exists when the defendant's contacts with the forum, whether or not related to the litigation, are "continuous and systematic"); <u>BP Chems. Ltd. v.</u> <u>Formosa Chem. & Fibre Corp.</u>, 229 F.3d 254, 259 (3d Cir. 2000) (<u>citing</u> <u>Helicopteros</u>).[11]  Specific personal jurisdiction, on the other hand, is proper when "the plaintiff's 'claim is related to or arises out of the defendant's contacts with the forum.'"  <u>Lehigh Coal & Navigation Co. v. Geko–Mayo,</u> <u>GmbH</u>, 56 F.Supp.2d 559, 565 (E.D.Pa.1999) (<u>quoting</u> <u>Mellon Bank (East) PSFS, N.A. v. Farino</u>, 960 F.2d 1217, 1221 (3d Cir.1992) (citation omitted)).  To successfully assert specific jurisdiction, a plaintiff must prove that the defendant has "'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or related to' those activities." <u>Burger King</u>, 471 U.S. at 472 (citations omitted).

To determine whether a defendant has had sufficient contact with the forum for the Court to exercise jurisdiction, the Court must inquire whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." <u>Burger King</u>, 471 U.S. at 474 (<u>quoting</u> <u>World–Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297(1980)).  The Supreme Court stated:

---

[11] According to the Court of Appeals for the Third Circuit, "the plaintiff must show significantly more than mere minimum contacts to establish general jurisdiction." <u>Provident</u> <u>Nat'l Bank</u>, 819 F.2d at 437 (<u>citing</u> <u>Dollar Sav. Bank v. First Sec. Bank of Utah</u>, 746 F.2d 208, 212 (3d Cir. 1984); <u>Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas</u>, 675 F.2d 587, 589 (3d Cir. 1982)).  Further, the nonresident's contacts to the forum must be "continuous and substantial."  <u>Id.</u> (<u>citing</u> <u>Gehling v. St. George's School of Medicine, Ltd.</u>, 773 F.2d 539, 541 (3d Cir. 1985); <u>Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am.</u>, 651 F.2d 877 (3d Cir. 1981)).

[W]here the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

Id. at 475. (internal citations omitted).

In contract actions, a "highly realistic" approach is required in determining whether a nonresident contracting party is subject to personal jurisdiction, because a "contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Burger King, 471 U.S. at 478. Where a contract is involved, the Court must look at the contract, its terms, prior negotiations, and the parties' course of dealing. Id.; Vetrotex, 75 F.3d at 151. Courts should also inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach. GE v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001).

Because the Court permitted these parties to conduct discovery on the issue of personal jurisdiction, and because the Court held a two-session evidentiary hearing in this case, which began on July 7, 2005, and, due to the parties' attendance and preparation issues, concluded a year later on July 5, 2006, Mr. Atiyeh has the burden of proving that personal jurisdiction is proper by a preponderance of the evidence. LaRose, 712 F. Supp. at 458 (citing Data Disc, 557 F.2d at 1285.

Mr. Atiyeh argues that he has established sufficient contacts between Defendants and the Commonwealth of Pennsylvania to warrant the Court's exercise of jurisdiction here.[12] Mr. Atiyeh's

---

[12] In his first response to Defendants' Motion to Dismiss, Mr. Atiyeh asserted only a "waiver" argument: Mr. Atiyeh argued that because his Amended Complaint was filed on July 21, 2004, and Defendants' Motion to Dismiss was not filed until December 15, 2004 that the Defendants waived their right to assert the defense of lack of personal jurisdiction. The Defendants, in turn, argued that no such waiver occurred.

four-page, post-hearing brief on the issue of jurisdiction, which is the only response he submitted that addressed the merits of the Defendants' jurisdictional arguments, contains a single citation to the record developed in this case, cites only a single case, and includes one citation to Black's Law Dictionary (to define the term "prima facie case").  Plaintiff offers as evidence his own affidavit and his testimony before the Court, and affidavits from Randal Hadeed, Richard Willeman, Arif Atiyeh, and Reverend Afaf Atiyeh Darcy.[13]  Arif Atiyeh also testified in person before the Court.  Plaintiff's brief contains two arguments, the first of which appears to be at least a quasi-argument for general jurisdiction; the second amounts to an argument for specific jurisdiction.

First, Mr. Atiyeh argues that the Hadeeds have "family ties" in Pennsylvania, that they visited Pennsylvania because of those family ties, and, because this was a "family" loan, these family ties suffice to establish personal jurisdiction in this case.[14]  This is a somewhat self-interested

_____

As the Defendants point out, at least one other court within the Third Circuit has held that as long as a defendant's first response to a complaint raises the issue of personal jurisdiction, the defense has not been waived.  See Foss v. Klapka, 95 F.R.D. 521, 522 (E.D. Pa. 1982).  Additionally, in asserting that the defense was waived, Mr. Atiyeh ignores the fact that the Court held a status conference with counsel on October 7, 2004, at which the Defendants' argument with respect to personal jurisdiction was discussed.  By Order of the Court subsequent to that meeting, the parties were permitted to conduct discovery with respect to the precise issue of personal jurisdiction, and the Defendants were granted leave to file a supplemental brief in support of their Motion to Dismiss. The Defendants timely filed their supplemental memorandum.  Mr. Atiyeh's waiver argument is not persuasive.

[13] The affidavits from the Plaintiff, Randal Hadeed and Richard Willeman were attached as exhibits to Mr. Atiyeh's Amended Complaint.  The affidavits from Arif Atiyeh and Reverend Atiyeh Darcy were submitted in connection with the evidentiary hearing conducted by the Court with respect to the jurisdictional issue.  These five affidavits, and four pieces of documentary evidence that are discussed below, comprise all of the evidence Mr. Atiyeh offered to support his jurisdictional arguments.

[14] Here, Plaintiff does not specify whether he believes general or specific personal jurisdiction exists.  Plaintiff's "family ties" argument seems to be at least a misguided attempt to establish general jurisdiction.

position to take, however, since Mr. Atiyeh claims that Anise Hadeed was his uncle and that Arif

Atiyeh, the Plaintiff's father, and Anise Hadeed, were "like brothers."  Pl. Supplemental. Mem. 3.

Thus, any argument that jurisdiction is proper because the Hadeeds have "family ties" in

Pennsylvania is essentially an argument that jurisdiction is proper because the Plaintiff resides in

Pennsylvania, which is not a winning position.  In any event, Plaintiff has made no showing that the

Defendants' contacts with Pennsylvania are "continuous and systematic" such that general

jurisdiction exists.  At best, the record reflects that Shirley and David Hadeed may have

occasionally visited Pennsylvania on vacation.  During the evidentiary hearing on jurisdiction,

Shirley Hadeed admitted that she visited Pennsylvania on vacation four or five times over a twenty

year period.  July 5, 2006 Tr. 82:5-9.  Neither counsel sought to elicit testimony from David Hadeed

as to how many times, if any, he had been to Pennsylvania.  Such contacts as these are not

continuous, systematic or substantial and do not suffice to establish general jurisdiction.  Thus, the

Court will consider Mr. Atiyeh's arguments only as they pertain to specific jurisdiction.

 To successfully assert specific jurisdiction, Mr. Atiyeh must prove that Shirley and David

Hadeed "'purposefully directed' [their] activities at residents of the forum and the litigation results

from alleged injuries that 'arise out of or related to' those activities."  Burger King, 471 U.S. at 472

(citations omitted).  Mr. Atiyeh argues that specific personal jurisdiction is proper because the

negotiations with respect to the alleged loans took place in Pennsylvania and because Shirley and

David Hadeed submitted payments to Mr. Atiyeh in Pennsylvania.  See Am. Compl. ¶ 15

("Jurisdiction is proper before this Court as all loan payments and negotiations took place at

Plaintiff's address is Lehigh County.").  Specifically, Mr. Atiyeh claims that he met with Anise,

Shirley and David Hadeed in Pennsylvania in 1996, where the loan was first discussed, that the

same parties met again in 2000, when they renegotiated the terms of the loan, and that Shirley and David Hadeed sent at least one payment – a check in 1999 for $315,000 – to him at his Pennsylvania address.

The Court will address all of the proffered jurisdictional facts, taking into account all of the evidence presented by the parties in this case, including testimony from the parties and various witnesses.

A.    *The 1996 Meeting*

Mr. Atiyeh alleges that he met with Anise Hadeed and Shirley and David Hadeed to discuss the alleged loan for the first time "on or about 1996" at "Plaintiff's address in Lehigh County, Pennsylvania." Am. Compl. ¶ 6. Throughout the discovery process in this case, the precise date and location of this alleged meeting has never been established.

Mr. Atiyeh cannot pin down exactly when this meeting occurred other than "on or around 1996." During the evidentiary hearing, Mr. Atiyeh testified that his first meeting with the Defendants and Anise Hadeed occurred in "springtime" of 1996, but he was unable to specify the month during which the meeting occurred. July 7, 2005 Tr. 27:12-13. During his deposition in this case, Mr. Atiyeh also stated that this first meeting occurred during spring of 1996. Def. Mot. Dismiss Ex. 17 at 11:3.[15] When he was questioned further, however, he said it could have been the spring or summer of 1996, but then said he was "not sure" whether the meeting even occurred in 1996. Id. 11:4-9.

_____

[15] Neither party formally placed the testimony from the Plaintiff's deposition into evidence in this case. However, the Defendants did submit the transcript from Plaintiff's deposition as part of the materials accompanying their motion. The Court has considered Mr. Atiyeh's deposition testimony only to see if it might clarify some of the numerous factual discrepancies.

Regarding the site of the alleged 1996 meeting, Mr. Atiyeh states that he met with the Hadeeds at "Plaintiff's address in Lehigh County." Am. Compl. ¶ 6. During the evidentiary hearing, Mr. Atiyeh testified that he met with the Hadeeds at his father's store in Whitehall, Pennsylvania. July 7, 2005 Tr. 26:9–27:11. However, the testimony from his father, Arif Atiyeh,[16] contradicts this account. Arif Atiyeh testified that, in the "winter of 1996," he met with Anise, Shirley and David Hadeed at his (Arif's) place of business, the "WOW #1," in Allentown, Pennsylvania. A. Atiyeh Aff. ¶ 3. During this visit, Arif Atiyeh claims that Anise, Shirley and David Hadeed told him that they wanted to borrow money to purchase or invest in property. Id. ¶ 4. Arif Atiyeh informed them that the Plaintiff might be able to make such a loan. Id. ¶ 5. He testified that he called Dennis Atiyeh – who at that time was at his own place of business – who agreed to loan money to the Hadeeds. July 5, 2006 Tr. 54:17-21, 55:5-7, 56:3-5. Arif Atiyeh states that he and Anise, Shirley and David Hadeed then drove to Dennis Atiyeh's office in Whitehall, Pennsylvania. A. Atiyeh Aff. ¶ 6. Arif Atiyeh claims that, at Dennis Atiyeh's office, Dennis Atiyeh agreed to loan money to the Hadeeds and that Dennis Atiyeh and the three Hadeeds, "worked out the terms of the loan." Id. ¶ 7. He states that Anise, Shirley and David Hadeed told him that Dennis Atiyeh would loan them the money and that they would repay the loan in monthly payments. Id. ¶ 8.

Arif Atiyeh's testimony conflicts with that of Dennis Atiyeh in at least two respects. First, Arif claims the 1996 meeting was in the winter,[17] while Dennis claims it was in the spring of 1996.

---

[16] Arif Atiyeh, father of the Plaintiff, testified that Anise Hadeed was his first cousin. A. Atiyeh Aff. ¶ 1.

[17] Mr. Arif Atiyeh was similarly unable to recall the date that he met with the Hadeeds in 1996 regarding the purported loan. In his affidavit, he stated that it was in the winter of 1996. A. Atiyeh Aff. ¶ 3. During the evidentiary hearing in this case, Arif Atiyeh could not specify which

Second, Arif claims the 1996 meeting occurred at Dennis's store, while Dennis claims it occurred at Arif's store.  Arif knows that the meeting did not occur at his own store because he drove with the Hadeeds to Dennis's store so that Dennis could meet with them regarding a loan.  Arif then returned to his own store.  To further confuse the stories (or at least anyone trying to sort them out sensibly), the one fact about which the Plaintiff has never wavered is that the only parties in attendance at the alleged 1996 meeting were the Plaintiff and Anise, Shirley and David Hadeed.  In other words, Mr. Atiyeh is clear that there are no corroborating witnesses.[18]  Certainly, there is no suggestion that Arif witnessed any tendering of a loan or actual discussion about it by the lender and borrower(s) together.

Further, the Plaintiff claims that he and Anise, Shirley and David Hadeed all signed a loan agreement, or at least a promissory note at the 1996 meeting.  July 5, 2006 Tr. 6:6-10.  However, although Mr. Atiyeh remains adamant that he lent the money to the entire Hadeed family, he vacillated as to whether David actually signed a promissory note with respect to this loan.  When he was pressed on this issue during the evidentiary hearing before the Court, the Plaintiff stated that he was not sure whether David did or did not sign a promissory note in 1996.  July 7, 2005 Tr. 40:21-22, 41:15-17.[19]  Mr. Atiyeh is certain that Shirley Hadeed executed a promissory note.  No note has

_____

month the meeting occurred, and could not confirm whether it was during the winter or the spring, but he remembered that it was not cold because they sat outside during the visit.  July 5, 2006 Tr. 51:13-22.

[18] Arif Atiyeh admits he was not present when Dennis Atiyeh supposedly discussed the terms of the loan with the Hadeeds.  He testified that he drove the Hadeeds to meet the Plaintiff and then returned to his store.  July 5, 2006 Tr. 55:5-7.

[19] Mr. Atiyeh retreated from the assertion that David Hadeed signed a promissory note when defense counsel noted that David would have only been 17 or 18 years old when Mr. Atiyeh claims this initial meeting occurred.  See generally July 7, 2005 Tr. 40:9-33.

been produced at any time.  Id. 44:22-25.

     B.     *The 2000 Meeting*

Mr. Atiyeh further alleges that he and Anise, Shirley and David Hadeed met again in Lehigh

County "on or about 2000."  Am. Compl. ¶ 11.  Plaintiff contends that at this meeting, he and the

"Defendants agreed to extend the time of repayment with the balance due and owing in 2002."  Id. ¶

12.  During the evidentiary hearing, Mr. Atiyeh again stated that he met with the Anise, Shirley and

David Hadeed at his office in Whitehall, Pennsylvania in 2000, July 7, 2005 Tr. 30:15-25, and that

no one else was present at this meeting, id. 35:3-5.  Mr. Atiyeh also stated that, although he claims

the parties renegotiated the terms of the loan at this meeting, this renegotiation was "verbal" and the

parties did not execute any documentation at this meeting.  July 5, 2006 Tr. 6:11-13.

Mr. Atiyeh presents testimony from his father and from his sister, Reverend Afaf Atiyeh

Darcy,[20] in an effort to corroborate his testimony on this point.  Arif Atiyeh testified that the Plaintiff

met with Anise, Shirley and David Hadeed in 2000 regarding the loan, however, Arif Atiyeh was not

actually present at any such meeting.[21]  Reverend Darcy, who in addition to being Plaintiff's sister (a

---

     [20] Reverend Darcy was not available to testify in this case.  Plaintiff's counsel stated that Reverend Darcy was in Louisiana doing missionary work  and that there was no way to produce her as a witness for the hearing.  July 5, 2006 Tr. 3:22-24.  Pursuant to the Court's November 8, 2005 Order (Docket No. 52), because defense counsel has not had an opportunity to cross-examine Reverend Darcy, her affidavit submitted on the Plaintiff's behalf should be striken from the record.  However, in an effort to give the Plaintiff the benefit of everything he has submitted, the Court will consider the affidavit from Reverend Darcy.  In any event, the Court finds that Reverend Darcy's affidavit has only minimal relevance to the issue of specific personal jurisdiction in this case.

     [21] Arif Atiyeh, in his affidavit, states that Anise, Shirley and David Hadeed met with the Plaintiff again in either 1999 or 2000.  A. Atiyeh Aff. ¶ 12.  However, he does not claim to have been present when this meeting took place.  When he was asked during cross-examination whether he was present at the 2000 meeting, he could not confirm that an actual "meeting" occurred.  He said, presumably in reference to the first meeting in 1996, that it was "negotiation by my phone" – referring to the fact that he claims to have called the Plaintiff who agreed, during

fact she excluded from her affidavit), also claims to be Anise Hadeed's niece.  A. Darcy Aff. ¶ 1.

The sum total of Reverend Darcy's testimony is that she met with Anise, Shirley and David Hadeed

in the winter of 1999 at Dennis Atiyeh's home in Whitehall, Pennsylvania, at which time she states

Shirley and David told her that they borrowed funds from Mr. Atiyeh and were visiting him to

discuss repayment of the loan.  A. Darcy Aff. ¶¶ 2-3.[22]  Reverend Darcy has not claimed to have any

personal knowledge that David or Shirley Hadeed actually met with Mr. Atiyeh in 1999 regarding

any aspect of the loan.

      C.    *Payments Sent to Pennsylvania*

The only allegations in Mr. Atiyeh's Amended Complaint that address any contacts Shirley

or David may have had with Pennsylvania, specifically with respect in any manner to the loan at

---

the telephone conversation to loan the Hadeeds money – and that the renegotiation "meeting" in
1999 or 2000 was not in fact a meeting, but was a "family reunion."  July 5, 2006 Tr.
55:18–56:5.  He stated only that "we don't make no meeting at family reunion, we have family.
My son have a birthday party, we go to his birthday party.  We enjoy ourselves not to be in
meeting, to be in meeting, for what?"  Id. 55:22-25.  Arif Atiyeh's testimony suggests that the
Hadeeds may have been in Pennsylvania in 1999 or 2000, but, because he was not present when
Dennis Atiyeh claims to have met then with the Hadeeds, any knowledge Arif Atiyeh may have
regarding what may have been discussed at this non-meeting "meeting," was gained secondhand.
Therefore, this testimony does not assist the Plaintiff in attempting to establish a jurisdictional
fact.

None of Arif Atiyeh's remaining testimony pertains to jurisdiction.  The only two
paragraphs in Arif Atiyeh's affidavit that arguably pertain to the jurisdictional facts at issue here
are his references to the 1996 meeting and the 2000 meeting.  A. Atiyeh Aff. ¶¶ 3,12.  Arif
Atiyeh does claim that Anise, Shirley and David visited with him in Allentown, Pennsylvania
three months after their visit in the winter of 1996.  Id. ¶ 9.  Further, "about a year later" Arif
Atiyeh claims that David Hadeed met with him at his store in Allentown, and that he met with
Anise, Shirley and David at Dennis Atiyeh's home "later that year."  Id. ¶¶ 10-11.  He does not
claim that any of these other meetings were in any way related to the purported loan at issue in
this case.

[22] Reverend Darcy also testified that she met with Anise, Shirley and David Hadeed in
2001 in Pennsylvania, and that she met with them "a number of times between 1996 and 2003"
in Pennsylvania.  A. Darcy Aff. ¶¶ 4-5.

issue in this case, pertain to the alleged meetings in 1996 and 2000 discussed above.  However, in an effort to establish personal jurisdiction, Mr. Atiyeh also asserts that Shirley and David Hadeed sent various payments to him in Pennsylvania.  Specifically, Mr. Atiyeh alleges that in January 1999, the Defendants repaid a portion of the loan, Am. Compl. ¶ 8, that they issued a check in the amount of $315,000 payable to him, id. ¶ 9, and that this check was returned by the Defendants' bank because the account had been closed, id. ¶ 10.  However, Mr. Atiyeh's Amended Complaint does not specifically allege that this alleged "check" was mailed to him in Pennsylvania by Shirley or David Hadeed.

Oddly, in support of his claim that this "check" was actually mailed  by Shirley or David Hadeed and was actually sent to him in Pennsylvania, he provides a withdrawal slip from the Jamaican bank, Mutual Security Bank Limited, in the amount of $200,000, signed by Anise Hadeed and dated March 26, 1996.  Def. Mot. Dismiss Ex. 2.  During the evidentiary hearing, Mr. Atiyeh claimed that this $200,000 withdrawal slip was the bad "check" that he referred to in his Amended Complaint.  July 5, 2006 Tr. 5:9-17.  However, because this withdrawal slip is signed by Anise Hadeed,[23] and not by Shirley or David, and because there is no evidence that this withdrawal slip was sent by Shirley or David Hadeed to Mr. Atiyeh in Pennsylvania it does nothing to bolster Plaintiff's jurisdictional argument.[24]

---

[23] During cross-examination at the evidentiary hearing, Shirley Hadeed testified that she and Anise Hadeed had an account at Mutual Security Bank Limited.  July 5, 2006 Tr. 85:23-25.  Mrs. Hadeed recognized the signature on the withdrawal slip as Anise Hadeed's signature.  Id. 86:21-24, 87:1-3.  Anise Hadeed had signed the slip in both English and Arabic.  Id. 87:1-3.  However, Mrs. Hadeed testified that as of March 1996, when this withdrawal slip was signed, this particular account was held in Anise Hadeed's name only, and not in her name.

[24] Furthermore, it simply cannot be the case that this withdrawal slip from 1996 was the payment Mr. Atiyeh claims to have received from the Hadeeds in 1999.  Mr. Atiyeh stated that he received a "check" from the Defendants "on or about January 1999" in the amount of

The sum total of the evidence presented by Mr. Atiyeh on the issue of personal jurisdiction amounts to his testimony that he met with Shirley and David Hadeed, along with Anise Hadeed, in Pennsylvania in 1996 and again in 2000 to discuss the loan. However, all of his testimony is vague and often inconsistent, both with his own testimony and with testimony presented by other witnesses. The testimony provided by Arif Atiyeh and Reverend Darcy provide minimal support for Mr. Atiyeh's assertions at best. Although both witnesses can place Shirley and David Hadeed in Pennsylvania at some point in either 1999 or 2000, neither of them have firsthand knowledge that Mr. Atiyeh actually met with David or Shirley Hadeed regarding the loan at issue here.

The other testimony offered by Mr. Atiyeh, including the affidavits from Randal Hadeed and Richard Willeman, is irrelevant to the issue of jurisdiction. For example, the affidavits of Randal

---

$315,000, whereas this withdrawal slip is (1) clearly not a check, (2) dated as of March 1996, three years prior to when Mr. Atiyeh claims to have received this check, and (3) in the amount of $200,000 instead of $315,000.

In addition, during his testimony before the Court, Mr. Atiyeh claimed that the Hadeeds repaid the loan by sending him checks ranging in amounts from $20,000 to $100,000. July 5, 2006 Tr. 7:12. A "withdrawal slip" in the amount of $200,000 clearly does not fit this description.

During Mr. Atiyeh's deposition, he testified that Anise and Shirley Hadeed provided him with this "withdrawal slip," which was dishonored by the Hadeeds' bank. Def. Mot. Dismiss Ex. 17 at 96:25–26:13. He stated that the Hadeeds sent this withdrawal slip to him in Whitehall, Pennsylvania, id. 97:19, but that he attempted to cash the "withdrawal slip" at the Mutual Security Bank Limited in Montego Bay, Jamaica. Id. 98:14-17. When he attempted to cash it, the bank said that the account had been closed. Id. 98:1-5. He further testified that although Anise and Shirley Hadeed sent him a payment, i.e., the "withdrawal slip," they told him to come to see them to receive payment. Id. 99:21-23. Although he testified that they told him to come to Jamaica, he testified that he flew to Miami, Florida, received the "check," but was unable to cash it because the account had been closed. Id. 99:25–100:10. It is not clear whether Mr. Hadeed is referring to the same payment or different payments that he attempted to cash in Florida and Jamaica. It is clear, however, that Mr. Atiyeh has offered no proof that Shirley or David Hadeed sent him a payment in Pennsylvania. Mr. Atiyeh's testimony in this regard is literally and figuratively all over the map, is wildly inconsistent, and is unreliable. It is, quite simply, not credible.

Hadeed and Richard Willeman do not refer to a single incident that occurred in Pennsylvania that would provide a "contact" between either of the Defendants and Pennsylvania.  Randal Hadeed professed to be Anise Hadeed's nephew and David Hadeed's cousin, which David Hadeed disputes.[25]  R. Hadeed Aff. ¶ 1.  Richard Willeman is a debt collection agent that Mr. Atiyeh hired to recover money owed to him by the Hadeeds under this purported loan.  Both Randal Hadeed and Richard Willeman claim to have examined the purported loan document that is now allegedly missing, R. Hadeed Aff. ¶ 3; R. Willeman Aff. ¶ 2, and Randal Hadeed claims to have discussed the loan with David Hadeed, via telephone, on at least two occasions, R. Hadeed Aff. ¶ 4.  Notably, however, neither of these non-party affiants attest that the purported loan was negotiated and/or executed in Pennsylvania.[26]

Not surprisingly, the Defendants' deny all of Mr. Atiyeh's allegations, including the proffered jurisdictional facts discussed above.  They do not merely dispute entering into a loan agreement with Mr. Atiyeh in Pennsylvania, however, they also deny ever meeting him, speaking to him or seeing him in Pennsylvania prior to this litigation.  Of specific importance to the jurisdictional issue before the Court, the Defendants deny that they met with Mr. Atiyeh in Pennsylvania to agree to such a loan, to renegotiate the loan, or that they made any payments to Mr.

_____

[25] At the evidentiary hearing in this case, David Hadeed denied knowing or ever speaking with Randal Hadeed.  July 5, 2006 Tr. 75:7-8, 78:2-3.  He denied having any familial ties with Randal Hadeed.  Id. 75:19-22.  He asserts that he first became aware of Randal Hadeed in connection with this litigation when his lawyer showed him Randal Hadeed's affidavit in this case.  Id. 77:15–78:3.

[26] The Defendants point out that the non-party affidavits contradict each other, in that Randal Hadeed states that he saw both of the Defendants' signatures on the loan documents along with Anise Hadeed's signature, R. Hadeed Aff. ¶ 3, while Richard Willeman purposefully struck the Defendants' names from the affidavit (suggesting that he did not prepare the affidavit himself), attesting that he only saw Anise Hadeed's signature on the document, R. Willeman Aff. ¶ 2.

Atiyeh in Pennsylvania.  (Though not relevant to the present narrow issue, it is not surprising that they deny categorically any loan at all.)

David Hadeed testified that prior to this litigation, he had never been introduced to or spoken to Dennis Atiyeh.  July 5, 2006 Tr. 72:12-16.  He testified that he saw Mr. Atiyeh once prior to this litigation at Anise Hadeed's shop in Jamaica.  Id. 72:16-18.  David Hadeed testified that he never entered into a loan transaction with Mr. Atiyeh in Pennsylvania, and never paid Mr. Atiyeh any money or received money from Mr. Atiyeh in Pennsylvania.  Id. 72:19–73:2.[27]

Shirley Hadeed's testimony is almost identical to David's.  She testified that she first met Dennis Atiyeh in Florida for depositions in this case in March 2005.  Id. 80:2–5.  She denied entering into any business transactions with Mr. Atiyeh, borrowing money from him, or paying him any money in Pennsylvania.  Id. 80:6-14.  Like David, Shirley testified that she first became aware that Mr. Atiyeh claimed that she owed him money when Mr. Atiyeh he sent letters to Anise Hadeed in Florida referencing the purported loan.  Id. 80:18–81:6.[28]

_____

[27] David further testified that he first became aware of the supposed events giving rise to this lawsuit in 2002.  At that time, Mr. Atiyeh had written a "threatening" letter to Anise Hadeed's attorney referencing this loan, which letter David had seen.  July 5, 2006 Tr. 73:17-22.

[28] Defendants introduced the testimony of Joan Gonzalez, Shirley Hadeed's younger sister, to support Shirley Hadeed's contention that she had not met Mr. Atiyeh prior to this litigation.  The gist of Ms. Gonzalez's testimony is that in the early fall of 1996 (which would have been several months after the meeting in the spring of 1996 when Mr. Atiyeh claims to have lent money to Shirley Hadeed), Mr. Atiyeh invited Ms. Gonzalez to his home in Allentown, Pennsylvania.  During this visit Mr. Atiyeh told her that he had never met her sister Shirley Hadeed, and asked her whether she and her sister looked alike.  July 5, 2006 Tr. 61:20-25.  Mr. Atiyeh contends that this conversation with Ms. Gonzalez never occurred and that he met Ms. Gonzalez through Shirley Hadeed.  Id. 90:16-21, 91:1-4.

The Defendants also presented the testimony of John R. Assad, who appears to be close with both the Hadeed and Atiyeh families.  He is a friend to the Hadeed family who knew Anise Hadeed since Anise emigrated from Syria in 1948, and a friend to the Atiyeh family for several decades as well.  July 5, 2006 Tr. 64:24–65:11.  Mr. Assad is not related by blood to any of the

It is worth noting the dearth of documentary evidence in this case.  Mr. Atiyeh claims that he

and the Hadeeds executed a written loan agreement or promissory notes with respect to the loan at

issue in this case,[29] yet he is unable to produce either the original or a copy of the purported loan

agreement or promissory notes.  Mr. Atiyeh asserts that the parties executed three inches' worth of

loan documents, and that he gave all of these documents to his former lawyer, and has not been able

to retrieve them.[30]  He claimed to have kept a statement of account, on which he recorded the

---

parties in this case, id. 64:24, 65:6-7, but he is godfather to David Hadeed, and his wife was a
godmother to Dennis Atiyeh, id. 65:12-15.  He testified that Shirley Hadeed visited Allentown,
Pennsylvania "six, seven, eight times over the past 20 or 30 years."  Id. July 5, 2006 Tr. 70:1-3.
He testified that he never saw Shirley or David together with Dennis Atiyeh.  Id. 66:22–67:2.
Mr. Assad testified that he was not present during any meeting between Mr. Atiyeh and the
Hadeeds regarding a loan and that he first became aware of a loan to Anise Hadeed, and not to
David or Shirley, when Mr. Atiyeh told him about it in 2002. Id. 67:3-5, 67:16–69:10.  Mr.
Assad testified further that Dennis Atiyeh never told him that Shirley or David Hadeed borrowed
money from him in Pennsylvania.  Id. 69:11-13.

[29] In an effort to diminish the importance of, or the absence of (or both), the loan
agreement in this case, Plaintiff argues that the "level of sophistication normally associated with
a commercial transaction is not present because of the family nature of the loan."  Pl. Br. Opp'n
3.  Plaintiff argues further that "the level of documentation . . . as it relates to the issue of
jurisdiction is not applicable."  Id.  Mr. Atiyeh misunderstands the nature of the Court's current
inquiry because it is his burden to prove Defendants' contacts with Pennsylvania by a
preponderance of the evidence.  If Mr. Atiyeh does not have documentary evidence to support his
jurisdictional arguments, then he must produce some other evidence to meet this burden.

[30] Mr. Atiyeh claims that he gave his entire file, which contained all of the documents
pertaining to this loan, to his then-lawyer James L. Heidecker, Jr.  According to Mr. Hadeed, he
sought Mr. Heidecker's counsel in an effort to retrieve the money the Hadeeds allegedly owed.
D. Atiyeh Aff. ¶¶ 4, 6.  In his July 18, 2004 Affidavit, Mr. Atiyeh claimed that Mr. Heidecker
was no longer practicing law, and that he had been unable to contact Mr. Heidecker in order to
obtain the loan documents.  Id. ¶ 5.  In the two and a half years since Mr. Atiyeh submitted this
affidavit, he apparently still has not succeeded in contacting Mr. Heidecker or retrieving any loan
documents from him.

Further, Mr. Heidecker was deposed in this case.  Although neither party introduced Mr.
Heidecker's deposition testimony into evidence in this case, Defendants claim that Mr.
Heidecker testified that he did not recall ever taking possession of any paperwork received from
Mr. Atiyeh regarding this loan.  Def. Supplemental Mem. 8.  Defendants claim that Heidecker

23

amounts of money he lent and the amounts of money repaid, and referenced checks that he claims to have received from the Hadeeds.  He claimed to have traveled to Florida and Jamaica to pursue this alleged debt.  Yet Mr. Atiyeh has not produced any loan documentation, bank records, cancelled checks, travel documents or the like.

The Court is conscious that it must limit its present inquiry to the issue of whether personal jurisdiction over the Defendants exists, and not address the merits of Mr. Atiyeh's claims.  However, one of Mr. Atiyeh's claims in this case is for breach of contract.  In a contract dispute, the mere existence of a contract with an out-of-state party does not automatically establish personal jurisdiction over that party, Burger King, 471 U.S. at 478, but the requisite contacts may be supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties.  Id. at 479; Mellon Bank, 960 F.2d at 1223.  The fact that Mr. Atiyeh has been unable to produce the original or a copy of the purported loan agreement in this case is not necessarily fatal to his jurisdictional argument, but it means that the Court must decide the jurisdictional issue without a piece of evidence that may have provided crucial jurisdictional facts.  Without the loan agreement, the only evidence the Plaintiff has provided to the Court to evaluate the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties, is his own testimony.[31]

---

recalled discussing a loan between Mr. Atiyeh and Anise Hadeed with Mr. Atiyeh, and that he saw "a piece of correspondence . . . or some sort of transmittal which would indicate a debt obligation."  Id.  Plaintiff did not refute Defendants' characterization of Mr. Heidecker's testimony in his motion papers or during the evidentiary hearing on this issue.

[31] During discovery on the jurisdictional issue, Mr. Atiyeh produced three documents, in addition to the "withdrawal slip" described above, that he claimed proved the existence of the loan, which of course was not the issue at hand.  In any event, none of these three documents has

the slightest impact on the issue of jurisdiction, or in any way implicates David or Shirley Hadeed.

Mr. Atiyeh produced (1) a letter from Anise Hadeed to an illegible recipient regarding business transactions relating to Western Union and English Sport; (2) a memorandum from Mr. Atiyeh to Anise Hadeed referring to an outstanding balance of $300,000; (3) and a handwritten letter from "Joe Atiyeh" to "Uncle" stating amounts of "total money lent in 1996" and the amount of "total funds repaid as of 1998." Def. Mot. Dismiss Exs. 3-5.

The first of these letters is a handwritten, one-page letter, dated June 15, 1998, which appears to be from Anise Hadeed to an illegible recipient, possibly the Plaintiff. Def. Mot. Dismiss Ex. 3. (David Hadeed denies, based on the handwriting, that this letter was written by Anise Hadeed. July 5, 2006 Tr. 73:3-16.) There is a fax number with a "610" area code, which is a Pennsylvania area code, written on the top of the page. This letter does not refer to a loan agreement. Instead, it refers to a "statement of account as of June 1, 1998" and to "charges for collection from Western Union." Id. It also refers to "English Sport," which may or may not be the approximate name of a business possibly owned by Mr. Atiyeh. This document does not address the loan at issue and does not establish any contact between either David or Shirley Hadeed and Pennsylvania. Accordingly, it is irrelevant to the Court's current inquiry.

The next document is a typed, one-page letter, also dated June 15, 1998, from Mr. Atiyeh to Anise Hadeed, which refers to "an outstanding balance of over $300,000." Def. Mot. Dismiss Ex. 4. Although the left-hand margin of this letter is illegible, it does appear that this letter was signed by Mr. Atiyeh. A heading on the top of the letter reads "From the Desk of Dennis Atiyeh," and lists Mr. Atiyeh's address in Whitehall, Pennsylvania. Although this letter could conceivably pertain to the loan at issue here, this letter does not implicate Shirley or David Hadeed, and does not establish any contacts between Shirley or David Hadeed and Pennsylvania. Therefore, it, too, is irrelevant.

The final letter is from "Joe Atiyeh" to "Uncle." See Def. Mot. Dismiss Ex. 5. Plaintiff testified that Joseph Hadeed is his brother. Def. Mot. Dismiss Ex. 17 at 122:8-10. "Uncle" presumably refers to Anise Hadeed. This letter states that "the total money lent in 1996" was $521,375, and "the total money repaid as of 1998" was $237,500. Def. Mot. Dismiss Ex. 5. Further, it states that "the difference of money is what I would be willing to accept," listed as $283,875. Id. This letter appears to refer to a debt owed by Anise Hadeed to "Joe Atiyeh." It would be a stretch to assume that the debt referred to in this letter is actually the purported loan at issue here. For one thing, this letter does not refer to a debt owed to the Plaintiff, but rather, refers to a debt owed to "Joe Atiyeh." In addition, none of the amounts of money stated in the letter align with the Plaintiff's allegations in this case. Plaintiff alleges that he lent the Hadeeds $500,000, not $521,375. See July 7, 2005 Tr. 45:10-13 ("It was $500,000 U.S. dollars . . . . I'm 100 percent sure of that."). In addition, Plaintiff alleges that the Hadeeds repaid him $185,000, not $237,500, and that the Hadeeds owe him $315,000, not $283,875. Furthermore, even if this letter was addressed to Anise Hadeed, and referred to money loaned to Anise Hadeed, Plaintiff

In <u>Vetrotex</u>, the Court of Appeals for Third Circuit held that in contract cases in which the defendant was merely a "passive buyer" of products from the forum state, the exercise of personal jurisdiction would be improper. <u>Vetrotex</u>, 75 F.3d at 152. The court distinguished such cases from cases where: (1) the "defendant solicited the contract or initiated the business relationship";[32] (2) the

---

has not established how this document relates to David or Shirley Hadeed or ties them to Pennsylvania. Therefore, given that this case only involves Shirley and David, this letter is also irrelevant to the jurisdictional issue.

No other documents pertaining to the issue of jurisdiction have been provided. According to Plaintiff's Response to Defendants' Request for the Production of Documents, Mr. Atiyeh has produced all relevant documents in his possession. Defendants requested that Mr. Atiyeh provide all documents that related to Anise, Shirley or David Hadeed's presence in Pennsylvania. In response to those requests, Mr. Atiyeh states both that he has previously provided any such documents to the Defendants, and also that he may have some photographs germane to this issue for which he will continue to search. Mr. Atiyeh has not subsequently provided any photographs or any other evidence.

[32] In <u>Mellon Bank</u>, which also involved a loan agreement between the parties, the court of appeals found that "by asking Mellon to lend money and offering to guaranty that debt, the defendants deliberately 'reached out beyond one state and created continuing relationships and obligations with citizens of another state.'" <u>Mellon Bank</u>, 960 F.2d at 1223 (<u>citing</u> <u>Travelers Health Ass'n v. Virginia</u>, 339 U.S. 643, 647 (1950)). The defendants in <u>Mellon Bank</u> actively solicited Mellon, the plaintiff bank, in the hopes that it would provide the financing they sought, and later sent correspondence to Mellon seeking to extend the due date of those obligations. <u>Id.</u> The court noted that "Mellon did not approach the borrowers seeking to lend money nor did Mellon initially request the guaranties. It was the defendants who approached Mellon and through this contact established a business relationship with a Pennsylvania entity." <u>Id.</u> In contrast to the case currently before the Court, however, in <u>Mellon Bank</u>, the defendants had signed bank notes, and guaranty and suretyship agreements. <u>Id.</u> All of these documents indicated that Mellon was a Pennsylvania entity, and required that all payments on the notes and on the guaranties and any other correspondence were to be sent to Mellon's Philadelphia address. <u>Id.</u> Thus, <u>Mellon Bank</u> is distinguishable here because, in addition to the evidence that the defendants approached the plaintiff and actively sought to establish a business relationship with it, there was substantial underlying evidence supporting the contacts that defendants established with Pennsylvania, such as signed agreements that established continuing obligations on the part of the defendants to make payments to Mellon in Pennsylvania. In this case, however, there is no such documentary evidence to support Mr. Atiyeh's testimony, which the Court has found to be unreliable.

26

"defendant sent any payments to the plaintiff in the forum state";[33] or (3) the "defendant engaged in extensive post-sale contacts with the plaintiff in the forum state."[34]  Id. at 152–53 (internal citations omitted).

However, a fair reading of Mr. Atiyeh's testimony provides shaky and insufficient evidence, at best, of two meetings in Pennsylvania involving the Defendants regarding this loan.  In this case, the Court is far from convinced that these two meetings actually occurred.  However, these two meetings, without additional evidence of jurisdictional contacts, do not constitute the minimum

_____

[33] In North Penn Gas Co. v. Corning Natural Gas Corp., 897 F.2d 687, 690 (3d Cir. 1990), the court of appeals found that the district had personal jurisdiction over the defendant Corning, a New York corporation.  The court found that the parties had entered into a Storage Agreement, which was "crucial" to the minimum contacts analysis.  Id.  Corning admitted that the agreement existed but argued that personal jurisdiction was lacking because it never actually stored gas in the North Penn storage fields in Pennsylvania.  Id.  This argument was unpersuasive because Corning's actions in entering into the Storage Agreement caused North Penn to reserve adequate space to allow Corning the right to store gas at any time in that field.  Id.  Thus, the court noted, "the existence of the Storage Agreement, whereby Corning made consecutive payments to North Penn into Pennsylvania and reserved space in North Penn's storage fields in Pennsylvania, indicates sufficient minimum contacts by Corning with Pennsylvania to establish personal jurisdiction."  Id.  Again, North Penn Gas is distinguishable from this case because no agreement has been produced that requires the defendants to perform continuing obligations – including making payments – in Pennsylvania.

[34] In Mesalic v. Fiberfloat Corp., 897 F.2d 696, 700 (3d Cir. 1990), the court of appeals entertained an action between a citizen of New Jersey and Fiberfloat, a Florida corporation that makes custom-built boats.  The court found that personal jurisdiction over the Florida defendant was proper.  It noted that the record was "replete with evidence of Fiberfloat's purposeful connection to New Jersey, including: (1) written correspondence from Fiberfloat on January 27, March 2, April 1, and May 27, 1988 to Mesalic's New Jersey residence; (2) delivery of the vessel by a Fiberfloat employee to the appellant in New Jersey and this same employee's attempt to repair the boat in New Jersey; and (3) work performed by another Fiberfloat mechanic in New Jersey from May 7 through May 27, 1988."  Id.  The court concluded that the fact that Fiberfloat delivered the boat to New Jersey and repaired the vessel in New Jersey as an accommodation to Mesalic did "not preclude such contacts from being sufficient minimum contacts to establish personal jurisdiction."  Id.  In Mesalic, unlike this case, there was substantial evidence of the defendant's contacts with New Jersey, including undisputed evidence of several incidents of the defendants' physical presence and conduct in New Jersey that was related to the transaction in question.

contacts required to support personal jurisdiction over Shirley and David Hadeed.

Assuming for the moment that Mr. Atiyeh entered into a loan agreement with Shirley and David Hadeed, Mr. Atiyeh's testimony suggests that Anise Hadeed may have "solicited the contract or initiated the business relationship" and that Anise Hadeed may have sent payments to Mr. Atiyeh in Pennsylvania. Mr. Atiyeh insists that the loan at issue was a "family" loan, a position he has been forced to take since Anise Hadeed has passed away, but his testimony as to Shirley and David's involvement in this loan is unconvincing, is refuted by the Defendants' testimony, and is not supported by a single shred of documentary evidence.

Furthermore, the Court simply does not find Mr. Atiyeh's testimony to be reliable or in any way believable. His testimony was erratic, and his behavior obstinate. There are too many gaps in Mr. Atiyeh's testimony which are not filled by other credible evidence. While he is adamant that he loaned money to the Hadeed family, his testimony has been vague and inconsistent with respect to when the loan was made, where the parties met to discuss the loan, what documents, if any, were executed at the time the loan was made, who executed the loan documents, whether Mr. Atiyeh remitted the proceeds of the loan in cash or checks (and how many cash payments or checks were remitted over how long a period), to whom Mr. Atiyeh gave the proceeds of the loan, who repaid the loan by sending payments to Mr. Atiyeh in Pennsylvania, when Mr. Atiyeh received those payments in Pennsylvania, and what the amounts of those payments were. The only fact witness that Mr. Atiyeh produced, his father Arif Atiyeh, was similarly unreliable. Both on cross-examination and on redirect examination by Plaintiff's counsel, Arif Atiyeh was evasive, refused to answer seemingly simple questions, and did not actually substantiate the Plaintiff's story since he often offered

conflicting testimony.[35]

Thus, the Court finds that Mr. Atiyeh has not established "minimum contacts" between Shirley and David Hadeed and Pennsylvania by a preponderance of evidence.

### III.    Traditional Notions of Fair Pay and Substantial Justice

Because, under the first inquiry, the Court finds that the Plaintiff did not establish the requisite "minimum contacts" between the Defendants and the Commonwealth of Pennsylvania that are sufficiently related to the circumstances giving rise to the claim in this case to support specific personal jurisdiction over the Defendants, it is not necessary to proceed to the second inquiry, whether exercising personal jurisdiction over the defendants would comply with notions of "fair play and substantial justice."

### CONCLUSION

For the reasons stated above, Shirley and David Hadeed's Second Motion to Dismiss will be granted because the Court lacks in personam jurisdiction over Shirley and David Hadeed.

S/Gene E.K. Pratter
Gene E.K. Pratter
United States District Judge

March 19th, 2007

---

[35] On redirect examination, Plaintiff's counsel asked Arif Atiyeh if he recalled seeing Anise, Shirley and David Hadeed in Lehigh County, Pennsylvania about 1999 or 2000 and he responded, "I'm sure I see them.  As to what year, what day, what month, I don't know.  I'm missing some area, some year, by a year or something.  But I know Shirley, David and Anise, I saw them in Allentown and Whitehall[, Pennsylvania].  I saw them and they're my cousin and what's the difference."  July 5, 2006 Tr. 59:14-20.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DENNIS J. ATIYEH,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SHIRLEY HADEED** | : | |
| **and DAVID HADEED,** | : | |
| **Defendants** | : | **04-CV-2621** |

**O R D E R**

    **AND NOW**, on this 19th day of March, 2007, upon consideration of the Defendants' Second Motion to Dismiss (Docket No. 61), Plaintiff's response thereto (Docket No. 72), and Defendant's Post-Hearing Brief (Docket No. 73), it is **ORDERED** that Defendants' Second Motion to Dismiss (Docket No. 61) is **GRANTED**, and Plaintiff's Amended Complaint is **DISMISSED**.  The Clerk of the Court is instructed to mark this case a **CLOSED** for all purposes, including statistics.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge